UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CARMALETA GIVANS,            )
                          )
       Plaintiff,          )
                          )
      vs.                  )       Case No. 4:10CV417 CDP
                          )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security,   )
                          )
       Defendant.       )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Carmaleta Givans' application for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*  Givans claims she is disabled because she suffers from a respiratory condition, chronic pain, obesity, back problems, and depression.  The Administrative Law Judge concluded, however, that Givans is not disabled, and Givans now appeals that decision.  Because I conclude that the ALJ's decision is supported by substantial evidence, I will affirm the decision of the Commissioner.

## Procedural History

On September 20, 2006, Carmaleta Givans filed for supplemental security income payments alleging disability beginning November 6, 2003.  The Social Security Administration denied Givans' application at the initial level, and Givans

filed a timely request for a hearing on her claim.  Givans appeared and testified at a

hearing on March 3, 2009.  The ALJ issued an opinion on March 27, 2009

upholding the denial of benefits.  On January 15, 2010, the Appeals Council of the

Social Security Administration denied Givans' request for review.  Accordingly,

the ALJ's determination stands as the Commissioner's final determination.  Givans

filed this request for review on March 10, 2010.

### Testimony Before the ALJ

At the time of the administrative hearing, Givans was forty-one years old

and lived with her grown daughter and two grandchildren, ages nine months and

five.  (Tr. 12-13.)  She lived in a ranch-style home with a basement.  (Tr. 12-13.)

She was a high school graduate and had also completed one year of college where

she majored in childcare.  (Tr. 14.)

Givans testified that she was suffering from respiratory problems including

sleep apnea, problems related to her excessive weight, knee pain, depression, and

arthritis in her back.  (Tr. 19-20, 22.)  She was using an oxygen tank at the time of

the hearing, and testified that she used it at all times including during sleep.  (Tr.

19.)  She stated that she also used a CPAP machine with a nasal mask for her sleep

apnea.  (Tr. 19.)  Givans stated that she was five feet seven inches tall, weighed

446 pounds, and had weighed over 400 pounds for at least two or three years.  (Tr.

14, 30.)  Doctors had talked to Givans about her weight, including options such as

gastric bypass; at least one doctor recommended that Givans lose weight on her own due to the dangers inherent in the surgery.  (Tr. 20.)  Givans further testified that her left leg had torn ligaments, a tumor, and that the cartilage in her knee was gone.  (Tr. 20.)  She stated that she had to wear house shoes a majority of the time because regular shoes put too much weight on her knee and caused it to hurt more.  (Tr. 25.)  She testified that she suffered from depression because she was molested by her father as a child and the fact that she did not feel like she had a life.  (Tr. 20-21.)  Givans stated she also had arthritis in her back, and had to keep a pillow propped under her leg to be able to sit.  (Tr. 22.)  She testified that her medications included an albuterol inhaler, Advair, Singulair, Cloxapen, Lamicital, OxyContin, Tramadol, and Tylenol.  (Tr. 25.)  She claimed the medications made her sleep a lot.  (Tr. 25.)

Givans testified that she did not like being around other people.  (Tr. 21.)  She stated that she did not go to visit friends or family.  (Tr. 32.)  She stated she did not like to be outside of her own space, or being places where she is closed in.  (Tr. 32.)  At the beginning of the hearing, she requested that the door be left open so that she would not be closed in.  (Tr. 11.)  Givans also testified that she had issues with food.  (Tr. 30-31.)  She stated that there were days where she did not want to eat, that she gained weight because of some of her medications, and that

-3-

she would not eat food if it looked gross or if different foods touched each other.
(Tr. 30-31.)

Givans testified that she can read when she needs to.  (Tr. 14-15.)  She did
not read magazines or newspapers, but occasionally read the Bible.  (Tr. 14.)  She
stated she could do simple arithmetic and sign a birthday card, but does not write
cards or letters.  (Tr. 15.)

Givans stated that she did not work at the time of the hearing.  (Tr. 16.)  Her
most recent job was with Home Health Services, from approximately 2000 until
2002.  (Tr. 16.)  She took care of clients in their homes by bathing them, changing
their bedding, cooking for them, and keeping their homes clean.  (Tr. 16.)  She quit
the job because she started feeling down, could no longer do the lifting required,
and started getting sick.  (Tr. 16.)  Prior to the Home Health Services position,
Givans had been employed as a gang outreach worker during 1996 and 1997, and a
latchkey teacher from 1993 until 1996.  (Tr. 17-18.)  The only lifting that was
required by either job was ten pounds or less of Givans' own materials.  (Tr. 18.)

When asked about her daily life activities, Givans said that she could not
really stand for any period of time and only stood to walk to the bathroom and
wash her hands.  (Tr. 23.)  She said she spent about two hours sitting or reclining
during an eight-hour day, and that she did not really walk.  (Tr. 24.)  She stated she
could only lift a few pounds and was unable to lift either of her grandchildren.  (Tr.

-4-

24, 28.)  She testified that she did not cook, wash dishes, do laundry, vacuum, or do work around the house.  (Tr. 27.)  She only went shopping once every few months with her daughter, and attended church on occasion.  (Tr. 24-25.)  Givans' daughter handled her medications, bathed and groomed her, and occasionally helped her wipe after bowel movements.  (Tr. 28, 30.)

The ALJ called a vocational expert, Jeffrey McGrowski, who had been provided with and reviewed Givans' file, including her past work history.  (Tr. 34.) McGrowski testified that Givans had previously worked as a latchkey teacher, a gang outreach worker, and a home health care provider.  The ALJ described a hypothetical individual for McGrowski with a high school diploma, one year of college education, and an equivalent work history to Givans; who could lift or carry twenty pounds occasionally and ten pounds frequently; who must have a sit/stand option at the work place with the ability to change positions frequently; who could occasionally climb stairs and ramps but never climb ropes, ladders or scaffolds; who could occasionally stoop, kneel, or crouch, but never crawl; who must avoid concentrated exposures to fumes, odors, dust, and gas; who could demonstrate adequate judgment to make simple work-related decisions, could perform some complex tasks, and should not work in a setting which includes constant regular contact with the general public.  (Tr. 36.)

The ALJ then asked McGrowski whether this hypothetical person could perform Givans' past work or any other jobs. (Tr. 36.)  McGrowski replied that such an individual could not do Givans' past work but could work in bench assembly, some work as an office helper, and some packing work.  (Tr. 36.)  The ALJ then asked about a hypothetical individual with the same characteristics except that this person could only carry or lift a maximum of ten pounds.  (Tr. 37.) McGrowski replied that this individual could perform the same jobs as the first hypothetical individual, as well as a packager of pharmaceuticals or small items, assembly of cosmetics or other similar items, or stuffer of small toys or pillows. (Tr. 37-38.)  The ALJ then asked about a hypothetical individual with the same characteristics as hypothetical two, except that this person could never climb stairs or ramps, could understand, remember and carry out at least simple instructions and non-detailed tasks, and maintain concentration and attention for two-hour segments over an eight-hour period.  (Tr. 38.)  McGrowski replied that the individual could perform the same work as in hypothetical two.  (Tr. 38.) McGrowski testified that there were a significant number of jobs in the national economy that fell into this category.  Finally, the ALJ asked about a hypothetical individual who also suffered from depression and because of her ability to ambulate could have up to four absences per month.  (Tr. 38.)  McGrowski replied

that such an individual would initially be able to perform jobs but would be terminated over time and unable to complete a trial work period.  (Tr. 38.)

Givans' attorney also asked McGrowski whether an individual could perform any of the previously mentioned jobs if depression severely limited that individual's ability to maintain concentration and attention for two-hour segments. (Tr. 39.)  McGrowski responded that such an individual could not maintain any jobs.  (Tr. 39.)

### Medical Records

On June 7, 2006, Givans was seen at the Family Health Center by Modesta Tako, M.D. for establishment of care.  (Tr. 429.)  Dr. Tako noted that Givans was morbidly obese and self-reported a history of asthma and chronic obstructive pulmonary disease requiring home oxygen use, seasonal allergies, and obstructive sleep apnea requiring CPAP use at night.  (Tr. 429.)  Her prescriptions were noted as home oxygen, albuterol, Advair, Singulair, Allegra, Flonase, and CPAP.  Dr. Tako described Givans as pleasant, without need of assistive device for ambulation, with a stable and steady gait.  (Tr. 429.)  He also observed her lungs to be clear to auscultation and percussion, and her heart rate to be normal.  (Tr. 429.)

Givans returned to FHC On July 12, 2006 for chronic pain in her back and legs.  (Tr. 431.)  There was no evidence of joint swelling, although she had left shoulder pain on palpation.  (Tr. 431.)  There was no erythema or increased joint

-7-

warmth, and Dr. Tako noted she could move her joints fairly well given her size.
(Tr. 431.)  Dr. Tako ordered an x-ray, and prescribed Ultracet, Flexeril and
ranitidine.  (Tr. 431.)  Her x-ray revealed that her vertebral bodies and
intervertebral disk spaces were maintained, the alignment of the spine was within
normal limits, and there were only mild degenerative changes in the lumbar spine.
(Tr. 375.)  An x-ray of Givans' left shoulder was normal.  (Tr. 376.)  She returned
to FHC on July 26, 2006 for a follow up of dyspepsia, and with complaints of
insomnia.  (Tr. 432.)  Dr. Tako continued her treatment with ranitidine for the
dyspepsia, and prescribed Restoril for the insomnia, as well as referring Givans to
a sleep study.  (Tr. 432.)

A sleep study at Boone Hospital Center Neurodiagnostic Services in August
of 2006 revealed a total sleep time of 7.1 hours, a sleep period of 8.0 hours, and a
sleep efficiency of 85.7%.  (Tr. 377.)  Irving M. Asher, M.D. concluded that
significant obstructive sleep apnea was not appreciated by this recording, which
was completed with use of nasal CPAP at 6 cm.  (Tr. 378.)  Continued use of home
nasal CPAP was recommended.  (Tr. 378.)

In September of 2006, Givans returned to FHC for dry patches on her skin,
and complained of difficulty sleeping and family stress.  (Tr. 433.)  She was not
suicidal, and Dr. Tako described her mood as "in no way depressed."  (Tr. 433.)
Dr. Tako recommended hydrocortisone ointment for her skin, a continuation of

Restoril, and a new prescription for Wellbutrin SR.  (Tr. 433.)  On October 4, 2006, Givans visited Dr. Tako for back pain, complaining that she had difficulty getting out of bed.  (Tr. 434.)  Palpatation of her lower back elicited tenderness that Givans claimed was severe.  (Tr. 434.)  She had trouble bending forward, and reported pain into her left buttock and causing numbness in her left thigh.  (Tr. 434.)  Dr. Tako prescribed prednisone and Percocet.  (Tr. 434.)  On October 18, 2006, Givans presented to FHC for sinus pressure and was prescribed Zithromax. (Tr. 435.)  On November 2, 2006, Givans reported chest pain with a burning sensation.  (Tr. 436.)  Her coughs were nonproductive, and she reported no shortness of breath.  (Tr. 436.)  Naproxin was prescribed, and Dr. Tako referred Givans to a pulmonologist.  (Tr. 436.)

On December 27, 2006, Givans was evaluated by Jennifer Clark, M.D. at the request of the Social Security Disability office.  (Tr. 333.)  After a physical exam, Dr. Clark noted that Givans was an obese female in no acute distress.  (Tr. 335.)  Givans walked with a normal gait, and had no footdrop or limp.  (Tr. 335.) She was able to get up and down with ease, and had no shortness of breath or wheezing.  (Tr. 335.)  Despite complaining of left shoulder pain, Givans had full flexion and extension and movement of both shoulders, as well as elbows, wrists, hips, knees, and ankles.  (Tr. 335.)  Givans had full active range of motion of the lumbar spine, cervical spine, and thoracic spine, but could not bend over and touch

the floor due to the large pannus in front of her.  (Tr. 335.)  Givans had no

problems going from sitting to supine, although she requested help coming from

supine up, and had weak abdominal muscles.  (Tr. 335.)  Dr. Clark noted that

Givans appeared in no distress and was cheerful.  (Tr. 335.)  Givans complained of

sweating from the pain, but Dr. Clark observed no perspiration and Givans' skin

was cool and dry.  (Tr. 335.)  Givans had slight hip flexion contractures.  (Tr. 335.)

Dr. Clark recommended that Givans could lift 50 pounds occasionally and 25

pounds infrequently, and placed no restrictions for standing, walking, sitting,

handling objects, hearing, speaking, or traveling.  (Tr. 336.)

Givans returned to Dr. Tako on January 2, 2007 for back pain.  (Tr. 425.)

She also reported facial pain and home stress.  (Tr. 425.)  She had no obvious

swelling to any joints, and her low back pain was difficult to quantify because of

her size.  (Tr. 425.)  Dr. Tako recommended Givans continue with naproxen,

Vicodin, and Nasonex.  (Tr. 425.)

On January 3, 2007, Givans saw Maria Gutierrez, Ph.D. for a psychological

examination (Tr. 337.)  Givans reported feeling depressed because she could not

care for herself or others.  (Tr. 337.)  Givans denied having auditory or visual

hallucinations, but reported that she sometimes thinks about taking her life.  (Tr.

339.)  Dr. Gutierrez diagnosed Givans with Major Depressive Disorder, Recurrent,

and a GAF of 45.  (Tr. 340.)  Regarding ability to do work-related activities, Dr.

Gutierrez found that Givans could understand and remember simple and detailed instructions, but may have difficulty carrying out simple instructions and sustaining concentration. (Tr. 340.) Dr. Gutierrez noted Givans' social skills as fair, and that she may have difficulty adapting to environment due to her depression. (Tr. 340.)

On February 28, 2007, Givans presented to Dr. Tako with left knee and ankle pain. (Tr. 426.) An x-ray revealed that her ankle had no fracture, dislocation, or subluxation, but there was a small plantar spur present. (Tr. 369.) An x-ray of her left knee showed mild condylar osteophytes and tibial spine osteophytes consistent with degenerative joint disease. (Tr. 369.) Givans returned to Dr. Tako on March 8, 2007 regarding the pain. (Tr. 427.) Dr. Tako noted she was probably depressed, and prescribed Vicodin. (Tr. 427.) During a follow-up on May 7, 2007, Givans stated she was having homicidal thoughts regarding her father, as she had been having dreams regarding a possible molestation as a child. (Tr. 417.) She was prescribed Percocet, and given a referral for psychiatric evaluation and treatment. (Tr. 417.)

On May 8, 2007, Givans underwent a pulmonary function test at Boone Hospital Center. (Tr. 385.) The test showed mild to moderate decrease in vital capacity and airway flow, and a severe decrease in diffusion. (Tr. 385.) It was noted that the test was effort dependent, and that Givans had coughing throughout

-11-

the testing leading to inconsistent values and effort.  (Tr. 385.)  Givans returned to

Dr. Tako on May 14, 2007 for chest congestion and shortness of breath.  (Tr. 418.)

She had no conversational dyspnea, mild scleral injection, and no conjunctival

drainage.  (Tr. 418.)  She was prescribed albuterol, Zithromax, and Mucinex.  (Tr.

418.)

On May 16, 2007, Givans saw Daniel Orme, Ph.D. for a psychological

evaluation.  (Tr. 362.)  Givans reported a history of depression and mental health

treatment, and that she was presently experiencing moods that were sad or irritable

and included reduced energy, poor appetite, excessive sleep, and anhedonia.  (Tr.

362.)  She denied current suicidal or homicidal thoughts, but admitted to have

thoughts of suicide in the past.  (Tr. 362.)  Dr. Orme reported that she was alert,

though irritable.  (Tr. 363.)  The diagnosis was Major depression, recurrent, major,

with a GAF of 55.  (Tr. 364.)

On the referral of Dr. Tako, Givans met with Terri Hoskins, L.C.S.W. on

May 31, 2007.  (Tr. 419.)  Her psychiatric symptoms included depressed mood,

fatigue, anhedonia, loss of appetite, crying spells, and sleeping excessively.  (Tr.

419.)  Givans discussed having dreams about being sexually abused by her father,

and reported having suicidal thoughts.  (Tr. 419.)  She denied auditory

hallucinations, though mentioned she sometimes saw "stuff flying."  (Tr. 420.)

Hoskins did not believe Givans to be homicidal or suicidal.  (Tr. 420.)  At a follow

-12-

up on June 12, 2007, Givans appeared more relaxed and in a lighter mood.  (Tr. 422.)  She reported spending an excessive amount of time in bed, and using isolation as a coping mechanism.  (Tr. 422.)

On June 5, 2007, Givans saw Dr. Tako for treatment of a cold.  (Tr. 421.)  She had no shortness of breath, nor conversational dyspnea.  (Tr. 421.)  Dr. Tako recommended she continue her use of Allegra and Singulair.  (Tr. 421.)  On June 14, 2007, Givans received a psychiatric examination by Enrique Dos Santos, M.D. (Tr. 366.)  Givans reported her belief that she had been sexually abused by her father.  (Tr. 367.)  She denied suicidal thoughts, but stated she thought of killing her father.  (Tr. 367.)  Dr. Dos Santos diagnosed Givans with major depression, recurrent.  (Tr. 368.)  Dr. Dos Santos ascribed a GAF score that the ALJ interpreted to be 80, although Givans contests that it actually reads as 50.  (Tr. 56, 368.)

On July 10, 2007, Givans presented to Dr. Tako complaining of fatigue and chest pain.  (Tr. 423.)  A precordial x-ray the following week showed a normal study.  (Tr. 373.)

Givans visited Ms. Hoskins again on July 16, 2007, and reported a difficult family trip and continued use of isolation for coping.  (Tr. 424.)  Givans was more talkative than usual, but was somewhat angry as she recalled the family trip.  (Tr. 424.)  On July 30, 2007, Givans discussed her sexual abuse with Ms. Hoskins, and

responded well to therapy.  (Tr. 409.)  She had no suicidal ideation at the time.
(Tr. 409.)

On August 8, 2007, Givans saw Sharon Carmignani, M.D., to establish care.
(Tr. 410.)  Dr. Carmignani described Givans as suffering from depression, morbid
obesity, asthma, chronic obstructive pulmonary disease, chronic pain in her back
and legs, and possible Pickwickian syndrome.  (Tr. 410.)  She was prescribed
Allegra, tramadol, Percocet, Wellbutrin, and Risperdal.  (Tr. 410.)  Givans returned
to Ms. Hoskins on August 22, 2007, who noted a gradually improving mood.  (Tr.
412.)  On August 28, 2007, Givans visited University Hospital and Clinics for
blurry vision, redness, and pressure behind her eyes.  (Tr. 392.)  Assessment was
mild episcleral inflammation of the left eye.  (Tr. 393.)

On September 12, 2007, Givans met with Ms. Hoskins to discuss anger
management and a depressed mood.  (Tr. 403.)  Ms. Hoskins noted that Givans had
intermittent auditory hallucinations, but was not bothered by them.  (Tr. 403.)
Further, Givans was more open to discussion of her issues, showed increased
awareness of her psychological state, and was less focused on her past traumas.
(Tr. 403.)  That same day, Givans saw Dr. Carmignani for sinusitis and concern
over pain her left leg.  (Tr. 401.)  Givans was concerned that deep vein thrombosis
was causing her leg pain, but Dr. Carmignani was "highly improbable."  (Tr. 401.)

-14-

An ultrasound revealed normal blood flow and no evidence of deep vein thrombosis.  (Tr. 396.)

On September 14, 2007, Givans saw Umonoibalo Ehimare, M.D. for psychological treatment.  (Tr. 443.)  Givans was alert and cooperative, but her mood was depressed and irritable.  (Tr. 443.)  Dr. Ehimare diagnosed her with major depressive disorder and post traumatic stress disorder, and a GAF of 55. (Tr. 445.)  On October 8, 2007, Givans went to the Family Health Center, where she reported stress and anger regarding her daughter's boyfriend.  (Tr. 405.)

On October 23, 2007, Givans saw Nathan Collins, M.D. and Andrew Quint, M.D. regarding increased dyspnea on exertion, cough, wheezing, and fever.  (Tr. 406.)  She was prescribed prednisone and DuoNeb.  (Tr. 406.)  She returned on October 26, 2007, with little improvement, and Dr. Carmignani increased her prednisone prescription and added Levaquin and Robitussin with codeine.  (Tr. 407.)  Also during October, 2007, Givans was evaluated by the Missouri Department of Health and Senior Services for home care.  (Tr. 398.)  It was noted she would receive daily help with bathing/hygiene, assistance with toileting, and assistance with medications.  (Tr. 398.)

Givans returned to Dr. Ehimare on November 5, 2007 regarding her mental health concerns.  (Tr. 446.)  Her sleep, energy level, motivation and mood were all

improved or improving.  (Tr. 446.)  She still had some depression, though was

neither homicidal nor suicidal.  (Tr. 446.)

On January 16, 2008, Givans saw Dr. Carmignani for continued treatment.

She was negative for chest pain, but experienced some low-back discomfort and

had "significant" osteoarthritis.  (Tr. 461.)  Dr. Carmignani prescribed Z-Pak for

her asthma/chronic obstructive pulmonary disease, as well as prednisone.  (Tr.

461.)  In February of 2008, Givans returned to Dr. Ehimare, who noted good

compliance with medications and good improvement with no depression.  (Tr.

459.)  On March 24, 2008, Givans returned to FHC complaining of leg pain and a

cough.  (Tr. 463.)

On March 28, 2008, Dr. Carmignani completed interrogatories related to

Givans' health.  (Tr. 464.)  She reported that Givans could lift ten pounds with no

restriction, had difficulty moving about because of her size, but was able to remain

in a seated position for approximately six hours of an eight hour workday at two-

hour intervals.  (Tr. 464-65.)  She reported that Givans could alternate sitting and

standing for an eight hour work day, but could not stoop because of her size.  (Tr.

465.)  On March 31, 2008, Ms. Hoskins also completed interrogatories concerning

Givans' condition.  (Tr. 467.)  Ms. Hoskins listed Givans' diagnosis as major

depressive disorder, recurrent, and PTSD.  (Tr. 467.)  She reported that Givans was

able to understand simple instructions, although her symptoms could interfere with

-16-

memory and ability to concentrate.  (Tr. 467.)  Ms. Hoskins further indicated that

Givans would have difficulty maintaining concentration and attention for an

extended period, working within a regular schedule and maintaining attendance,

and working with proximity to others.  (Tr. 468-69.)  On April 23, 2008, Dr.

Ehimare also completed the interrogatories.  (Tr. 471.)  He also listed Givans'

diagnosis as major depressive disorder, recurrent, and PTSD, and reported that

Givans' symptoms could interfere with her ability to maintain concentration,

sustain an ordinary routine, work with others, complete a normal work day, and

accept instructions and respond appropriately to criticism from supervisors.  (Tr.

471-74.)

On April 24, 2008, Givans saw Ms. Hoskins, who noted an increase in

irritability and sleep trouble, both as a result of neck and back pain.  (Tr. 478.)  On

May 30, 2008, Dr. Ehimare noted that Givans was sleeping eight hours per night

with no nightmares, had good energy and motivation, and had no mood swings nor

thoughts of suicide.  (Tr. 476.)  Givans had three more appointments with Ms.

Hoskins in June and July of 2008, during which Givans reported difficulty

sleeping, feeling sad, and wanting to isolate from others.  (Tr. 480-82.)  Givans

also referred to "Becky Ann," who she identified as her "protector."  (Tr. 480.)

In July of 2008, Givans twice returned to Dr. Carmignani, presenting with

pain in her left knee, hip, ankle, and shoulder.  (Tr. 483-84.)  She had tenderness in

-17-

the joints, and Dr. Carmignani wondered about a meniscus tear in the left knee.

(Tr. 484.)  X-rays and an MRI were ordered, and Givans was told to do various

exercises in combination with her taking oxycodone, Ultram, Tylenol, and Mobic.

(Tr. 484.)  On August 14, 2008, she saw Dr. Carmignani for a sinus infection, and

was prescribed a Z-Pak.  (Tr. 485.)  The MRI of her knee showed moderate to

severe medial compartment degenerative changes.  (Tr. 485.)  She was prescribed a

motorized cart, as well as Percocet.  (Tr. 485.)

Givans had a chest x-ray on February 2, 2009, which revealed no pulmonary

disease, normal distribution of ventilation, and a mild restrictive ventilatory defect.

(Tr. 488-89.)

## Legal Standard

A court's role on review is to determine whether the Commissioner's

findings are supported by substantial evidence on the record as a whole.  *Gowell v.

Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a

preponderance, but is enough that a reasonable mind would find it adequate to

support the ALJ's conclusion.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir.

2000).  As long as there is substantial evidence on the record as a whole to support

the Commissioner's decision, a court may not reverse it because substantial

evidence exists in the record that would have supported a contrary outcome, *id.*, or

because the court would have decided the case differently.  *Browning v. Sullivan*,

958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is

substantial, a court considers "evidence that detracts from the Commissioner's

decision as well as evidence that supports it."  *Singh v. Apfel*, 222 F.3d 448, 451

(8th Cir. 200) (citation omitted).

To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the
claimant;

(3)     the medical evidence from treating and consulting physicians;

(4)     the plaintiff's subjective complaints relating to exertional and
non-exertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments;
and

(6)     the testimony of vocational experts when required which is
based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th

Cir. 1980).

Disability is defined in the social security regulations as the inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

-19-

months.  42 U.S.C. § 416(i)(l); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) and 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national

economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. §§ 404.1520 and 416.920.

When evaluating evidence of subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Hecler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
>
> 2. the duration, frequency, and intensity of the pain;
>
> 3. precipitating and aggravating factors;
>
> 4. dosage, effectiveness and side effects of medication;
>
> 5. functional restrictions.

*Id.* at 1322.

## The ALJ's Findings

The ALJ found that Givans does not suffer from a disability within the meaning of the Social Security Act at any time through the date of the decision. He issued the following specific findings:

1.    The claimant has not engaged in substantial gainful activity since September 20, 2006, the application date.  20 C.F.R. §§ 416.971 *et seq*.

2.    The claimant has a recurrent major depressive disorder, obstructive sleep apnea, restrictive lung disease and obesity.  These are severe in combination.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1.  20 C.F.R. §§ 416.925 and 416.926.

4.    The claimant can lift and carry ten pounds on a regular basis throughout the work day.  The claimant requires the ability to alternate between sitting and standing frequently.  The claimant cannot climb stairs, ramps, ropes, ladders or scaffolds.  The claimant cannot crawl.  The claimant can occasionally stoop, kneel and crouch.  Due to her respiratory impairment, she must avoid concentrated exposure to fumes, odors, dusts and gases.  The claimant can understand, remember and carryout at least simple instructions and non-detailed tasks.  She can maintain concentration and attention for two hour segments over an eight hour period.  She should not perform work which requires constant and/or regular contact with the general public.

5.    The claimant has no past relevant work.  20 C.F.R. § 416.965.

6.    The claimant is a younger individual with at least a high school education.

7.    The claimant does not have transferable skills.

-22-

8.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  20 C.F.R. §§ 416.969 and 416.969(a).

9.   The claimant has not been under a disability, as defined in the Social Security Act, since November 6, 2003, the alleged onset date.

The ALJ concluded that, although there was evidence of impairments including a recurrent major depressive disorder, obstructive sleep apnea, restrictive lung disease and obesity, the medical records showed that none of the impairments presented consistently for twelve months.  The ALJ found that there was inconsistent treatment with regard to Givans' respiratory issues and reported joint pain, and treating physicians did not report either as disabling or causing a deficit in function.  The ALJ found that Givans' psychiatric diagnoses were based on subjective complaints, that the medical records showed many inconsistencies, and that Givans was often reported as having no abnormalities of mood.  He also discounted the interrogatories of Ms. Hoskins and Dr. Ehimare, as they were completed in response to litigation rather than in the course of treatment, and were generally inconsistent with the medical facts and record.  The ALJ found that Givans was generally not credible, as based on inconsistent statements such as those regarding her level of education, and the misalignment of her self-reported symptoms with those observed by various medical personnel.

**Discussion**

When reviewing a denial of Social Security benefits, a court cannot reverse an ALJ's decision simply because the court may have reached a different outcome, or because substantial evidence might support a different outcome. *Jones ex rel. Morris v. Barnhard*, 315 F.3d 974, 977 (8th Cir. 2003); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court's task is a narrow one: to determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. 42 U.S.C. § 405(g); *Estes v. Barnhard*, 275 F.3d 722, 724 (8th Cir. 2002). On appeal, Givans raises two main issues. First, she claims that the ALJ's findings are not supported by substantial evidence on the record as a whole. Second, she claims that the ALJ was wrong in failing to find that her posttraumatic stress disorder was a severe impairment. Because I find that the decision denying benefits was supported by substantial evidence and that the ALJ correctly addressed Givans' PTSD, I will affirm the decision.

<u>The ALJ's Findings are Supported by Substantial Evidence</u>

Givans makes Givans makes two primary arguments in her claim that the findings are not supported by substantial evidence. First, Givans argues that the ALJ wrongly found that she did not meet the requirements of § 12.04, for affective disorders. Second, she argues that the ALJ failed to make specific findings in regard to the limitations caused by her obesity.

<u>Affective Disorder:</u>

Givans argues that the ALJ erroneously found that she did not meet the requirements of § 12.04, for affective disorders.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  Section § 12.04 has several subparts, and to be met the claimant must satisfy both parts A and B, or all of part C.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  With regard to part A, the ALJ considered subpart (1), which lists symptoms of depression, and found that:

> The claimant's affective disorder has not resulted in 1) documented persistence of a depressive syndrome characterized by at least four of the following:  anhedonia or pervasive loss of interest; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulties concentration or thinking; thoughts of suicide or hallucinations; delusions or paranoid thinking...

(Tr. 48.)  Givans argues, however, that the record shows she suffered from many of the listed symptoms, including anhedonia, decreased energy, feelings of worthlessness, and auditory hallucinations.

Givans' medical records do reflect that she suffered from many of these symptoms at various times.  She reported insomnia in July and September of 2006 (Tr. 432-33), excessive sleep in May of 2007 (Tr. 362, 419), and sleep trouble in April of 2008 (Tr. 478.)  She reported anhedonia in May of 2007 (Tr. 362, 419.)  Givans reported having suicidal thoughts in January of 2007 (Tr. 339), and homicidal thoughts in March and May of 2007.  (Tr. 417, 367.)  She reported

having reduced energy levels or being fatigued in May of 2007 (Tr. 362, 419), and
July of 2007.  (Tr. 423.)  Givans also reported having visual hallucinations in May
of 2007 (Tr. 420), and intermittent auditory hallucinations were noted in
September of 2007.  (Tr. 403.)

However, mere presence of the listed symptoms is not sufficient to satisfy §
12.04.  The symptoms must also be "medically documented" and "persistent."  20
C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  The ALJ specifically stated that there
was not a "documented persistence" of the symptoms.  (Tr. 48.)  There is
substantial evidence to support this finding.  Despite Givans' complaint of insomnia
in July of 2006, an August sleep study revealed a total sleep time of 7.1 hours with
an 85.7% sleep efficiency.  (Tr. 377.)  In November of 2007, Dr. Ehimare reported
that Givans' sleep and energy levels had improved or were improving.  (Tr. 446.)
On April 24, 2008, Givans reported sleep trouble, but one month later Dr. Ehimare
noted that she was sleeping eight hours per night with no nightmares.

Although Givans reported having suicidal and homicidal thoughts in the first
few months of 2007, she specifically denied having any such thoughts both before
and after that time.  (Tr. 362, 420, 433, 446.)  Similarly, Givans reported having
auditory and visual hallucinations once each (Tr. 403, 420), but denied them on
several other occasions.  (Tr. 339, 403, 420.)  In September of 2006, Dr. Tako
described Givans as "in no way depressed."  (Tr. 433.)  Although she showed

symptoms of depression between January and May of 2007, by June she appeared to be more relaxed and in a lighter mood.  (Tr. 337, 362, 419, 422.)  Givans showed similar improvement in August through November of 2007.  (Tr. 403, 412, 446.)  By February of 2008, Dr. Ehimare noted good improvement with "no depression."  (Tr. 459.)  While the record shows that Givans did suffer some of the listed symptoms at various times, there is substantial evidence to support the ALJ's finding that no four of the symptoms were present "persistently."

Furthermore, the ALJ determined that Givans did not satisfy the requirements of part B of § 12.04, which requires that her affective disorder result in at least two of the following:  marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).  Givans testified that she did not like being around other people and did not leave her house often.  (Tr. 21, 32.)  She also stated that she did not do work around the house, and required assistance with her daily hygiene.  (Tr. 27-28, 30.)  However, this testimony is inconsistent with much of the medical records.  Dr. Gutierrez noted her social skills as "fair," and other doctors reported Givans as being "alert" and "cooperative."  (Tr. 340, 363, 443.)  The ALJ cited numerous similar observations by Givans' various doctors.  (Tr. 56-58.)  He concluded, "For

the many reasons and factors that the claimant's allegations of disability are found not credible, so too are the claimant's allegations of severely limited daily activities found not credible."  (Tr. 58.)  Although there is some evidence to indicate restriction in activities of daily living and maintaining social function, there is also substantial evidence to support the ALJ's finding to the contrary.[1]

Obesity and Residual Functional Capacity:

Givans argues that the ALJ improperly accounted for her obesity in his findings.  Givans argues that the ALJ failed to make specific findings in regard to the limitations caused by her obesity, improperly assessed her residual functional capacity, and assessed Givans' credibility and weight of the various medical source opinions.

An ALJ must make specific findings as to the claimant's limitations and how those limitations affect the claimant's residual functional capacity.  *Pfitzner v. Apfel*, 169 F.3d 566, 568-69 (8th Cir. 1999).  Social Security Ruling 02-1p, 2002 WL 34686281 (S.S.A. Sept. 12, 2002), requires an ALJ to take an individual's obesity and the combination of obesity with other impairments into account when determining whether her obesity is severe.  Givans argues that the ALJ did not

---

[1]Givans argues that the ALJ was wrong in his finding that, "The record does not demonstrate complete inability to function independently outside the area of one's home."  (Tr. 48.)  However, this is a requirement of § 12.06(C), not 12.04, and thus is irrelevant to the determination of Givans' affective disorder.  Furthermore, insofar as the record addresses this issue, substantial evidence exists to support the ALJ's findings on the matter.

address the relationship between her obesity and her back and leg pain, blood pressure, sleep apnea, fatigue, respiratory issues, and immobility.  However, the Eighth Circuit has held that an ALJ properly considers the combined effects of a claimant's impairments when the ALJ separately discusses each impairment and still concludes that the claimant does not have a combination of impairments that render her disabled.  *Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011).

The ALJ concluded that although Givans' obesity, along with her other impairments, were severe in combination (Tr. 47), the impairments did not meet any listing and did not preclude her from all work.  (Tr. 48, 59.)  The ALJ took Givans' many impairments into consideration in determining her residual functional capacity.  A claimant's residual functional capacity is what he or she can still do despite physical or mental limitations.  20 C.F.R. pt. 404.1545(a); *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  Although the ALJ is not limited to considering only medical evidence in making this assessment, the ALJ is "required to consider at least some supporting evidence from a professional," because a claimant's residual functional capacity is a medical question.  *Lauer*, 245 F.3d at 704.

Here, the ALJ determined:

-29-

> The claimant can lift and carry ten pounds on a regular basis
> throughout the work day.  The claimant requires the ability to
> alternate between sitting and standing frequently.  The claimant
> cannot climb stairs, ramps, ropes, ladders or scaffolds.  The claimant
> cannot crawl.  The claimant can occasionally stoop, kneel and crouch.
> Due to her respiratory impairment, she must avoid concentrated
> exposure to fumes, odors, dusts and gases.  The claimant can
> understand, remember and carry out at least simple instructions and
> non-detailed tasks.  She can maintain concentration and attention for
> two hour segments over an eight hour period.  She should not perform
> work which requires constant and/or regular contact with the general
> public.

(Tr. 49.)  In making this determination, the ALJ made specific findings regarding

each of Givans' individual impairments.

The ALJ found that although "the claimant is obese" (Tr. 49), "there is no

persuasive evidence that the claimant's obesity is accompanied by severe

degenerative joint disease or degenerative disc disease" and "the record does not

document that the claimant's obesity precludes sedentary work."  (Tr. 49.)  The

ALJ then discussed Givans' complaints of joint pain and immobility in great detail.

He noted that despite multiple instances in the record of Givans complaining of

joint pain, the medical records do not support this finding.  (Tr. 53.)  The ALJ

points to a February 12, 2006 examination with Dr. Tako, which revealed no

evidence of joint swelling or increased joint warmth despite Givans' complaints of

chronic leg and back pain.  (Tr. 53, 431.)  Dr. Tako found no swelling of the joints

again  in a January 2007 exam.  (Tr. 53, 425.)  The ALJ also referred to Dr. Clark's

December 2006 consultative examination of Givans, wherein Dr. Clark notes that

Givans had "no acute distress, a normal gait, the ability to get up and down with

ease, full strength in the upper extremities, free movement of the left shoulder, no

patellofemoral crepitation, no warmth or redness of any joints, no swelling of any

joints and no spasm.  (Tr. 53, 335.)  Dr. Clark further reported that Givans had full

lumbar motion of the spine, could "bend without limitation," and despite difficulty

touching the floor and arising from a reclined position, Givans had no difficulties

going from sitting to supine.  (Tr. 54, 335.)  In February of 2007, an x-ray of

Givans' left knee showed only "mild" degenerative joint disease, and a left ankle x-

ray revealed a small plantar spur and no acute pathology.  (Tr. 53, 369.)  The ALJ

noted that an MRI revealed moderate to severe medial compartment degenerative

changes in Givans' left knee, but that the record failed to indicate how long the

degenerative changes had existed, the expected response to treatment, or that the

degenerative joint disease precluded sedentary work.  (Tr. 55, 485.)

Similarly, the ALJ found that although "the record documents [that] the

claimant has sleep apnea...the record does not establish that the claimant

experiences significant limitations of function related to a sleep apnea condition

that has not been amenable to treatment through medication, dental devices, a Bi-

PAP or surgery."  (Tr. 49.)  The ALJ specifically pointed to a sleep study at Boone

Hospital Center in August of 2006, when Dr. Asher concluded that "significant

obstructive sleep apnea was not appreciated by [the] recording."  (Tr. 49, 377-78.)

-31-

The ALJ also noted that Givans' apnea had been compensated for with a Bi-PAP in June of 2003, and an August 2005 sleep study revealed obstructive sleep apnea with a "good response to Bi-PAP." (Tr. 49.)

With regard to fatigue, the ALJ further noted that "the record does not document that the claimant is frequently found with objective medical findings of sleep deprivation." (Tr. 49-50.) In November of 2007, Givans was noted to have improved energy. (Tr. 57, 446.) The ALJ further noted that Givans reported decent sleep and waking "refreshed" from February to May of 2008. (Tr. 57, 459, 476.)

Regarding Givans' respiratory issues, the ALJ noted that she was diagnosed with a restrictive lung disease in June of 2003 and asthma in June of 2004. (Tr. 50.) He also cited her chronic use of oxygen, as reported by various physicians throughout her course of treatment, and various reports of shortness of breath. (Tr. 50.) However, the ALJ found that the medical evidence was "extremely inconsistent with allegations of a severe and disabling respiratory impairment and the reported continuous use of oxygen." (Tr. 51.) He found that although many doctors mentioned Givans' use of oxygen, none of the doctors actually prescribed oxygen as treatment or medication. (Tr. 51.) On August 8, 2007, Dr. Carmignani noted that the oxygen supplementation was "for unclear reasons." (Tr. 50, 410.)

In December of 2006, Dr. Clark reported that Givans had no shortness of breath or wheezing.  (Tr. 51, 335.)  The ALJ noted a lack of treatment for respiratory symptoms between February and September of 2007.  (Tr. 51-52.)  Although a pulmonary function test in May of 2008 showed mild to moderate decrease in vital capacity and airway flow and a severe decrease in diffusion, the test was effort dependent and coughing by Givans led to inconsistent values and effort.  (Tr. 52, 385.)  The ALJ further noted that the medical records fail to show that Givans was being treated for respiratory distress from April to August of 2008.  (Tr. 52.)  The ALJ found that the medical treatment records failed to document that her asthma or restrictive lung disease are disabling or uncontrollable, or that there were ongoing objective medical findings of disabling deficits in respiratory function or of chronic obstructive pulmonary disease.  (Tr. 52-53.)  In discussing her respiratory condition, the ALJ specifically found that "the above facts do not preclude a finding that the claimant is capable of at least sedentary work."  (Tr. 53.)

Givans also argues that the ALJ failed to take into account the relationship between her obesity and elevated blood pressure.  However, in the entire medical record there is only one mention of an elevated blood pressure, and that was in May of 2000 when her blood pressure was 140/88.  (Tr. 229.)  During the relevant period, no doctor mentioned her blood pressure as a concern, and in September of 2007 it was even recorded as low as 110/70.  (Tr. 401.)

Givans further argues that the ALJ discounts 100 percent of her testimony, and gave undue weight to the opinion of Dr. Clark in comparison to the opinions of other doctors and medical personnel.  Evidence of pain and severity of other symptoms is necessarily subjective in nature.  Therefore, an ALJ must look to more than just objective medical evidence, or the lack thereof, in determining whether and to what extent a claimant's symptoms affect the ability to perform work-related activities.  *Halpin v. Shalala*, 999 F.2d 342, 346 (8th Cir. 1993); *Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991).  Under the framework set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), an ALJ must fully consider all evidence relating to the subjective complaints, including the claimant's work record, as well as observations of the claimant by others (including treating and examining doctors) as to such matters as daily activities; the intensity, duration, and frequency of the symptoms and conditions causing and aggravating the symptoms; and functional limitations.  *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008).  An ALJ must consider these matters but does not have to discuss each one of them in relation to the claimant.  An ALJ is permitted to discount the claimant's complaints if they are "inconsistent with the evidence as a whole." *Id*. (quoting *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007)).  When discounting a claimant's complaints, the ALJ is required to "detail the reasons for discrediting the

testimony and set forth the inconsistencies found." *Ford*, 518 F.3d at 982 (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)).

Here, the ALJ properly considered Givans' testimony and made credibility findings supported by the evidence in the record. The ALJ determined that Givans' testimony was not credible in part because there was a lack of medical evidence supporting her claims. (57-58.) Although an ALJ may not discount testimony solely due to a lack of medical evidence, this is one factor that may properly be considered. *Halpin v. Shalala*, 999 F.2d 342, 346 (8th Cir. 1993). The ALJ detailed many instances where Givans gave inconsistent testimony, or testimony that was otherwise incompatible with the medical records. She made multiple inconsistent statements regarding her education level. (Tr. 57, 334, 338, 363). The ALJ noted the many inconsistencies between Givans' reported distress and symptoms, as compared with the objective observations and test results reported by her various doctors. (Tr. 54, 56.)

The ALJ also took into consideration Givans' failure to comply with her physicians' recommendations. (Tr. 54-55.) An ALJ may properly consider a claimant's noncompliance with a prescribed treatment in assessing the claimant's credibility. *See Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001). Despite Givans' argument to the contrary, use of noncompliance for credibility purposes is not inconsistent with the restrictions of SSR 02-1p. SSR 02-1p applies only to the

use of "failure to follow prescribed treatment for obesity" when making the determination to deny or cease benefits, and not when making credibility determinations.  SSR 02-1p.  Thus, there is substantial evidence supporting a finding that Givans' testimony as to her symptoms and limitations was not credible.

Givans also argues that the ALJ gave undue weight to the opinion of Dr. Clark, and improperly discounted the opinions of Dr. Carmignani, Dr. Tako, and Dr. Gutierrez.  "ALJs are not obliged to defer to treating physician's medical opinions unless they are 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in the record.'"  *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) (quoting *Ellis v. Barhart*, 392 F.3d 988, 995 (8th Cir. 2005)).  "An ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence.'"  *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).

Here, the ALJ repeatedly referred to "objective medical findings."  (Tr. 54.)  He found that objective findings by Givans' treating physicians did not include "significant deficits in strength, neurological function, range of motion, posture, sensation, reflexes, pulses or gait...[or] significant deficits in the claimant's abilities to squat, stand, walk, sit, lift, carry, bend or stoop."  (Tr. 54.)  Although Dr. Tako

and Dr. Carmignani both made note of Givans' joint pain and respiratory

symptoms, these were made largely based on self-reporting by Givans, and were

inconsistent with the various medical tests administered by those same doctors.

(Tr. 51-53.)  The ALJ clearly relied on the medical opinions of Givans' treating

physicians when those opinions were supported by objective medical evidence.

Additionally, the ALJ took into consideration Dr. Carmignani's interrogatory

responses, which indicated that Givans' impairments did not require her to assume

a supine or reclined position, that she was able to alternate between sitting and

standing for an eight out work day, that she could sit for six hours in an eight hour

work day with breaks at two hour intervals, that she had some difficulty moving

because of her size, and that there was no limitation on her ability to use either

hand, lift more than ten pounds, or stand and walk for a total of two or more hours.

(Tr. 55.)  In evaluating Dr. Gutierrez's psychological evaluation of Givans, the ALJ

took into consideration the fact that most of his findings were based on subjective

complaints, and reflected inconsistencies with the medical records as a whole.  (Tr.

55.)

    While the ALJ did rely heavily on the evaluation by Dr. Clark, he did not

merely rubber stamp her opinions, but rather considered them in the context of the

records as a whole.  Dr. Clark recommended that Givans could lift 50 pounds

occasionally and 25 pounds infrequently, and placed no restrictions for standing,

-37-

walking, sitting, handling objects, hearing, speaking, or traveling.  (Tr. 336.)  In

determining Givans' residual functional capacity, however, the ALJ concluded that

Givans could lift and carry ten pounds on a regular basis throughout the work day;

requires the ability to alternate between sitting and standing frequently; cannot

climb stairs, ramps, ropes, ladders or scaffolds; cannot crawl; can occasionally

stoop, kneel and crouch.  (Tr. 49.)  These are greater restrictions than

recommended by Dr. Clark, and as discussed above, take into consideration the

medical opinions and test results as shown in the record as a whole.  The ALJ also

accounted for Givans' respiratory symptoms, finding that she must avoid

concentrated exposure to fumes, odors, dusts and gases.  (Tr. 49.)

There is thus substantial evidence to support the ALJ's findings in

determining Givans' residual functional capacity.[2]  He made the required specific

findings both in regard to Givans' obesity and her obesity in combination with

other impairments.  The ALJ appropriately considered Givans' credibility, and

appropriately weighed the various medical source opinion.

---

[2]Givans also argues that the ALJ erroneously relied on medical records from prior to the date of her application for supplemental security income benefits.  While it is true that such records are "of limited relevance," *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008), I find that the ALJ's findings are supported by substantial evidence even discounting the earlier records.

<u>ALJ's Treatment of Givans' Posttraumatic Stress Disorder</u>

Finally, Givans argues that the ALJ erred in failing to find that her posttraumatic stress disorder was a severe impairment.  Givans argues that the ALJ did not sufficiently inquire about Givans' PTSD at the hearing, and erred in his failure to find that her PTSD was a severe impairment.

Givans argues that the ALJ's questions about PTSD were extremely limited.  However, the record shows that the ALJ asked multiple open-ended questions allowing Givans to discuss her symptoms.  (Tr. 20-21.)  He asked Givans about her psychological symptoms, and even pushed her to disclose the molestation by her father.  (Tr. 20.)  In addition to inquiring about the symptoms of her depression, the ALJ asked why Givans said she felt like she didn't have a life.  (Tr. 20-21.)  He asked about her daily activities, and her interactions with the public.  (Tr. 14-15, 24-25, 27.)  An ALJ has a duty to fairly and fully develop the record, even when the claimant is represented by counsel.  *Taylor ex rel. L.B. v. Astrue*, No. 4:09CV1453 TCM, 2011 WL 572443 (E.D. Mo. Feb. 15, 2011).  However, the claimant must show that information omitted must have added to the records already in evidence.  *Weber v. Barnhart*, 348 F.3d 723, 725 (8th Cir. 2003).  Here, Givans fails to specify what information or records the ALJ failed to elicit, and how it would have bolstered her claim.

-39-

Even if the ALJ erred in failing to find that Givans' PTSD was a severe impairment, this constitutes no more than harmless error. *See Amis v. Astrue*, No. 4:09CV1376 CAS, 2010 WL 3040265 at *13 (E.D. Mo. July 14, 2010). Because the ALJ found that Givans suffered other severe impairments, he continued to Step 5 of the analysis and a determination of her residual functional capacity. As such, he was required to consider any non-severe impairments when determining Givans' RFC. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). A review of the ALJ's decision shows him to have considered Givans' complaints and symptoms related to PTSD in his RFC analysis, making the Step 2 determination harmless. *Amis*, 2010 WL 3040265 at *13; *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.3d 240, 244 (6th Cir. 1987).

The ALJ took note of a consultative evaluation performed by Dr. Gutierrez, who diagnosed Givans with recurrent major depressive disorder. (Tr. 55, 340.) However, the ALJ noted that much of Dr. Gutierrez's findings were based on Givans' subjective complaints, which the ALJ considered not fully credible for the reasons stated above. (Tr. 55.) The ALJ also took into consideration evaluations by Dr. Orme, Dr. Dos Santos, Ms. Hoskins, and Dr. Ehimare, including Dr. Ehimare's diagnosis of PTSD in September of 2007. (Tr. 56-57, 445.) In evaluating the psychological evidence, the ALJ found much of it to be inconsistent with the record as a whole. In particular, the ALJ contrasted Givans self-reported

psychological symptoms with the observations of multiple doctors regarding

Givans' well-being and demeanor.  (Tr. 56-57.)  He noted:

> It is significant that the medical treatment records do not document
> frequent or long term psychiatric hospitalization.  The medical
> treatment notes do not document any medical observations, by any
> treating psychiatrist or psychologist, of significant abnormalities or
> deficits with the respect to the claimant's mood, affect, thought
> processes, concentration, attention, pace, persistence, social
> interaction, activities of daily living, speech, psychomotor activity,
> focus, contact with reality, eye contact, orientation, demeanor, abilities
> to cope with stress, abilities to work without decompensation, abilities
> to understand and follow instructions, judgment, insight, cognitive
> function or behavior, for twelve months in duration, and despite
> treatment.

(Tr. 56.)  Furthermore, the ALJ did take Givans' psychological symptoms into

consideration in determining her RFC, finding that she could only maintain

concentration for two hour segments over an eight hour period, and should not

perform work which requires constant and/or regular contact with the general

public.  (Tr. 49.)  As discussed in the previous section, these findings by the ALJ

are supported by substantial evidence in the record.

For the reasons discussed above, I find that the decision denying benefits was

supported by substantial evidence, and I will affirm the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying

benefits is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 29th day of March, 2012.